Loyd v. Griffin, 2022 NCBC 30.

STATE OF NORTH CAROLINA

IREDELL COUNTY

ASHTON K. LOYD,

          Plaintiff,

v.

JAMES MICHAEL GRIFFIN and
GRIFFIN INSURANCE AGENCY,
INC.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 2394

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

1. This matter is before the Court on the Defendants' Motion to Dismiss Second Amended Complaint (the "Motion") pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). (ECF No. 87.)

2. For the reasons set forth herein, the Court GRANTS in part and DENIES in part the Motion.

*Levine Law Group, P.A., by Michael J. Levine and Cathy A. Williams, Austin Law Firm, by John S. Austin, and Mauney PLLC, by Gary V. Mauney, for Plaintiff Ashton K. Loyd.*

*Bennett & Guthrie, PLLC, by Mitchell Hendrix Blankenship and Joshua H. Bennett, for Defendants James Michael Griffin and Griffin Insurance Agency, Inc.*

Robinson, Judge.

## I.     INTRODUCTION

3. The Second Amended Complaint asserts seven claims for relief. Moving Defendants seek to have all claims dismissed: (1) First Claim for Relief (Breach of Fiduciary Duty), brought against James Michael Griffin; (2) Second Claim for Relief (Constructive Fraud), brought against James Michael Griffin; (3) Third Claim for

Relief (Conversion), brought against all Defendants; (4) Fourth Claim for Relief (Unjust Enrichment), brought against all Defendants; (5) Fifth Claim for Relief (Constructive Trust & Accounting), brought against all Defendants; (6) Sixth Claim for Relief (Alternative Remedy of Recission), brought against all Defendants, and (7) Seventh Claim for Relief (Punitive Damages), brought against all Defendants.

## II. FACTUAL BACKGROUND

4. The Motion is brought pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Accordingly, the Court is limited to its review of the relevant pleading—the Second Amended Complaint—and any documents referred to in the pleading that may be properly considered. *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citation omitted).

5. Therefore, to the extent that any party has relied on extraneous evidence to support their respective positions on the Motion, the Court has not considered that evidence. The parties' mere reference to additional documents does not automatically convert a motion to dismiss into one for summary judgment. *See Estate of Belk v. Boise Cascade Wood Prods. L.L.C.*, 263 N.C. App. 597, 599 (2018) ("[T]he trial court is not required to convert a motion to dismiss into one for summary judgment simply because additional documents are submitted . . . . Where it is clear from the record, namely from the order itself, that the additional materials were not considered by the trial court, the 12(b)(6) motion is not converted into a Rule 56 motion." (internal quotation marks, brackets, and citation omitted)).

6. The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6), but only recites those factual allegations from the Second Amended Complaint that are relevant and necessary to the Court's determination of the Motion.

7. Defendant James Michael Griffin ("Griffin") is a resident and citizen of Mecklenburg County, North Carolina. (S. Am. Compl. ¶ 17, ECF No. 83.)

8. Defendant Griffin Insurance Agency, Inc. ("GIA") is a North Carolina corporation with its principal office located at 135 Gasoline Alley, Iredell County, North Carolina. (S. Am. Compl. ¶ 18.)

9. Plaintiff Ashton Loyd ("Loyd") is a resident and citizen of Iredell County, North Carolina. (S. Am. Compl. ¶ 16.)

10. Griffin formed GIA on 29 June 2001, through which he sold insurance policies as a Nationwide Mutual Insurance Company ("Nationwide") principal agent. (S. Am. Compl. ¶¶ 22, 25.)

11. On 19 November 2001, GIA issued 1500 shares representing the entirety of outstanding GIA stock to Griffin. (S. Am. Compl. ¶ 116.) On the same day, Griffin and Charles E. Moore, III ("Moore") were elected directors of GIA's board of directors, and GIA's board authorized Moore to purchase 500 shares of GIA stock; he did so on 18 February 2002. (S. Am. Compl. ¶¶ 115, 116.) Accordingly, Griffin transferred 500 shares of GIA stock to Moore, leaving Griffin with 1000 shares. (S. Am. Compl. ¶ 116.)

12.     GIA adopted corporate bylaws, authorized by its Board of Directors, on 10 February 2002. (S. Am. Compl. ¶ 118.)

13.     Plaintiff Loyd began selling insurance policies for Liberty Mutual Insurance Company ("Liberty") shortly after graduating college in 1992, doing so for almost ten years. (S. Am. Compl. ¶ 20.)

14.     Sometime in 2002, Griffin arranged a meeting with Loyd proposing they "join forces" with the goal of Loyd succeeding Griffin as a Nationwide primary agent. (S. Am. Compl. ¶ 23.)

15.     Loyd declined the initial offer but was again approached by Griffin in 2004. Loyd accepted the second offer with the understanding that he would go into business with Griffin, as partners, and Griffin would prepare Loyd to become head of GIA. (S. Am. Compl. ¶ 24.)

16.     From 2004 through 2009, Loyd sold Nationwide insurance policies for GIA. Loyd was promoted[1] on 26 March 2010 via an "Agency Reorganization Plan," which installed Loyd as responsible for directing all personnel and operational decisions within various GIA locations. (S. Am. Compl. ¶¶ 27–28.)

17.     On 30 June 2009, GIA redeemed Moore's 500 shares of GIA stock via a Stock Redemption Agreement. As a result, Griffin became the sole remaining shareholder. (S. Am. Compl. ¶¶ 132–33.)

18.     On 31 March 2010, at the direction of Griffin, Loyd formed Loyd Insurance Agency, Inc. ("LIA"). (S. Am. Compl. ¶ 32.) Griffin and Loyd then entered into three

---

[1] The Complaint fails to state the position to which Loyd was "promoted."

Revenue Stream Purchase Agreements ("Revenue Agreement(s)") in March 2010, May 2012, and October 2017. (S. Am. Compl. ¶ 33.)

19. The purpose of the Revenue Agreements, according to Griffin, was to finance Loyd's purchase of GIA. (S. Am. Compl. ¶ 33.) Through the Revenue Agreements, Griffin assigned the revenue from GIA's Nationwide insurance sales at various GIA locations to Loyd. In return, Loyd executed promissory notes requiring him to pay Griffin a sum of $1,805,364.58 plus ten percent of the revenue streams from the GIA locations at Mooresville and Statesville, NC. (S. Am. Compl. ¶ 35.)

20. Loyd and Griffin also entered into an Asset Purchase Agreement ("Asset Agreement") in March 2010 through which Loyd agreed to purchase GIA property such as office equipment and fixtures at the sites covered by the Revenue Agreements. (S. Am. Compl. ¶ 37.)

21. In both the Revenue Agreements and the Asset Agreement, LIA was referred to as "LOYD INSURANCE AGENCY, INC., a North Carolina corporation d/b/a Griffin Insurance Agency." (S. Am. Compl. ¶ 39.)

22. On or about 1 July 2012, Griffin, through GIA, proposed that he and Loyd enter into a Corporate Associate Agent Agreement ("Agent Agreement") allowing LIA to act as an exclusive seller of Nationwide insurance policies under the terms of the GIA contract with Nationwide. (S. Am. Compl. ¶ 41.) The Agent Agreement also stipulated that both Loyd and LIA were independent contractors and not employees of GIA. (S. Am. Compl. ¶ 103.)

23.    Under Griffin's leadership and with his permission, GIA began an agency-wide practice of issuing Certificates of Insurance ("COI(s)") against Nationwide policies. GIA agents would accommodate Griffin's family members and VIP clients by issuing COIs as proof of insurance to demonstrate active insurance coverage prior to Nationwide's issuing a physical written policy. (S. Am. Compl. ¶ 50.)

24.    As long as a client had "actual coverage, in a client policy somewhere," it "became the practice of nearly all GIA staff to issue COIs to such clients" upon request, and "[n]o one that did this at GIA understood this to be a violation of the law[.]" (S. Am. Compl. ¶ 51.)

25.    From 2015 through 2019, nine such COIs were issued to members of Griffin's family by a GIA employee who directly reported to Griffin, despite the COIs having named as insureds individuals who were not formally insured. (S. Am. Compl. ¶ 53.)

26.    In June 2018, Griffin told Loyd that he intended to cancel the Revenue Agreements and instead was going to merge GIA with LIA. (S. Am. Compl. ¶ 60.)

27.    At this point, Loyd owed less than a million dollars under the Revenue Agreements and offered to accelerate his payments on those contracts in lieu of merging LIA and GIA, but Griffin rejected the offer. (S. Am. Compl. ¶ 61.)

28.    On 25 June 2018, Griffin presented Loyd with two documents, the "Agreement and Plan of Merger between Griffin Insurance Agency, Inc. and Loyd Insurance Agency, Inc." (the "Merger Agreement") and the "Shareholders Agreement." (S. Am. Compl. ¶¶ 62, 66.)

29. The Merger Agreement offered Loyd an ownership interest in GIA in exchange for the merger of GIA and LIA, subject to the terms and conditions of the Shareholders Agreement. (S. Am. Compl. ¶¶ 62, 66.)

30. That same day, Loyd and Griffin—in his capacity as Trustee for the J. Michael Griffin Revocable Trust (the "Griffin Trust")[2]—signed both the Merger and Shareholders Agreements, effectuating the merger of GIA and LIA. (S. Am. Compl. ¶ 64.)

31. Even though the agreements making Loyd a shareholder of GIA were signed on 1 July 2018, the Griffin Trust did not transfer the required shares to Loyd until 1 December 2018. Also, on 1 December 2018, Andrew S. Patton ("Patton") was added as a party to the Shareholders Agreement. In all, the Griffin Trust transferred 345 shares of GIA stock to Loyd and 165 shares of GIA stock to Patton. (S. Am. Compl. ¶ 64.)

32. As of 1 December 2018, share transfer records reflect that the Griffin Trust owned 490 shares of GIA stock, Loyd owned 345 shares, and Patton owned 165 shares, for a total of 1000 outstanding shares. (S. Am. Compl. ¶ 93.)

33. Despite GIA's share transfer records, Griffin and GIA expressed the ownership interest of GIA shareholders in varying percentages across different documents. On 17 July 2019, GIA represented to the IRS via its 2018 tax filings that Griffin personally owned 86.213698 percent of GIA, Loyd owned 12.852055 percent

[2] The Complaint does not specify when the Griffin Trust became the owner of stock in GIA, and the record before the Court properly considered on the Motion fails to provide that information.

of GIA, and Patton owned 0.934247 percent of GIA. (S. Am. Compl. ¶ 157.) Elsewhere in documents on the same tax filing, Griffin was listed as owning 66 percent of GIA's common stock, Loyd was listed as owning 23 percent, and Patton was listed as owning 11 percent. (S. Am. Compl. ¶ 158.)

34. By 12 November 2019, Griffin began to seek potential buyers for GIA, or alternatively, a merger partner who would offer a payout to GIA shareholders. (S. Am. Compl. ¶ 69.)

35. In February 2020, GIA received two offers for purchase via letters of intent. (S. Am. Compl. ¶¶ 71–73.) On 4 February 2020, Leavitt Group Enterprises, Inc. ("Leavitt") offered to purchase eighty percent of GIA's business and outstanding issued shares for a total sum between $26,867,552 and $28,500,000 based on earnings performance. (S. Am. Compl. ¶¶ 72–73.) Twenty days later, on 28 February 2020, Relation Insurance, Inc. offered to pay $26,850,000 for all of GIA's business and assets. (S. Am Compl. ¶ 71.)

36. Also, during February 2020, amid these incoming offers, one of Griffin's subordinates conducted a "routine desk audit" which included a review of COIs issued by Loyd to clients of GIA. (S. Am. Compl. ¶ 75.) As a result, Griffin reported to Nationwide and to the North Carolina Department of Insurance ("NCDOI") that Loyd had been involved in issuing faulty COIs. (S. Am. Compl. ¶ 78.)

37. Nationwide investigated the report and found that more than sixty COIs were issued "for policies that either did not exist or for which the type or extent of coverage represented under the policy did not exist," ten of which were issued by

Loyd. (S. Am. Compl. ¶ 79.) NCDOI did not make any findings of fact or reach any conclusions of law regarding Loyd's conduct. (S. Am. Compl. ¶ 80.)

38. Sometime after the Nationwide investigation, Griffin terminated Loyd as an officer of GIA. (S. Am. Compl. ¶ 83.) Griffin claimed that under the Shareholders Agreement, Loyd's termination of employment was a "triggering event" that mandated Loyd to sell and GIA to repurchase Loyd's shares of GIA stock on a discounted basis. (S. Am. Compl. ¶ 102.)

39. After Loyd's termination, Griffin held a special shareholder meeting on 12 March 2020 by "invoking a 'Consent in Lieu of the Special Meeting of the Shareholders of Griffin Insurance Agency, Inc.,'" (the "Consent Document") purporting to include all GIA shareholders' consent to force redemption of Loyd's shares in GIA. (S. Am. Compl. ¶¶ 84–85.) However, Patton was the only shareholder who signed the Consent Document. (S. Am. Compl. ¶ 85.) Loyd neither consented to nor attended the meeting. (S. Am. Compl. ¶ 90.)

40. GIA's bylaws specifically require that "[a]ction taken by the Shareholders without a meeting shall constitute Shareholder action if written consent to the action in question is signed by all of the Shareholders and filed with the Minutes of the proceedings of the Shareholders, whether done before or after the action is taken." (S. Am. Compl. ¶ 87.)

41. Despite lack of all shareholder signatures on the Consent Document, Griffin created a document entitled "Minutes of the Special Meeting of the board of Directors and Shareholders of Griffin Insurance Agency, Inc." purporting to document the

actions that took place during the 12 March 2020 shareholder meeting, including authorization of GIA's repurchase of Loyd's outstanding shares of stock. (S. Am. Compl. ¶ 89.)

42.   Sometime between March and April 2020, after the 12 March 2020 meeting, Griffin attempted to have Loyd sign a severance agreement effecting the repurchase of Loyd's 345 shares of GIA stock for $800,000. (S. Am. Compl. ¶ 97.) The severance agreement also offered that GIA would exercise its "best efforts" to remove Loyd's liability for personal guarantees of GIA's debts in excess of 5.8 million dollars. (S. Am. Compl. ¶ 100.) Loyd did not agree to and did not sign the severance agreement. (S. Am. Compl. ¶ 100.)

43.   On 20 May 2020, Griffin rejected the purchase offer from Relation Insurance, Inc. citing "[t]he unfortunate circumstances, involving minority partner Ashton Loyd . . ." as the reason for rejection. (S. Am. Compl. ¶ 81.)

44.   On 31 December 2020, the Griffin Trust, Patton, and Leavitt entered into and executed a Stock Sales Agreement (the "Sale Agreement"), which stated that the Griffin Trust owned 990 shares of GIA stock and Patton owned 165 shares of GIA stock for a total of 1,155 outstanding shares. (S. Am. Compl. ¶¶ 166–67.)

45.   Under the terms of the Sale Agreement, Griffin sold 785.95 shares of the Griffin Trust's stock to Leavitt. (S. Am. Compl. ¶ 168.) The Sale Agreement did not mention Loyd as an owner of shares of GIA stock. (S. Am. Compl. ¶¶ 166–67.)

46.   Loyd filed his Second Amended Complaint, following the Court's Order granting leave to do so, (ECF No. 82), on 25 January 2022, seeking damages for claims

against Griffin and GIA for breach of fiduciary duty, constructive fraud, conversion, unjust enrichment, constructive trust and accounting, alternative remedy of rescission, and punitive damages. (S. Am. Compl. 47–57.)

## III. PROCEDURAL BACKGROUND

47. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

48. Loyd filed his original Complaint on 25 September 2020. (ECF No. 3.)

49. On 26 October 2020, the case was designated a mandatory complex business case and assigned to the North Carolina Business Court. (ECF Nos. 1, 2.)

50. An Amended Complaint was filed on 11 January 2021, (ECF No. 29), following the Court's Order on Consent Motion to Amend Complaint filed the same day, (ECF No. 28).

51. On 25 January 2022, the Court granted leave for Loyd to file a Second Amended Complaint. (ECF No. 82.)

52. The Second Amended Complaint was filed on 1 February 2022. (ECF No. 83.)

53. Griffin and GIA filed their Motion to Dismiss Second Amended Complaint on 3 March 2022. (ECF No. 87.)

54. The Motion has been fully briefed, (Brief in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 88 ["Br. Supp."]; Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, ECF No. 93 ["Br. Opp."]; Defendants' Reply to Plaintiff's Opposition to

Motion to Dismiss Second Amended Complaint, ECF No. 94 ["Reply Br."]), and on 7 June 2022 the Court conducted a hearing on the Motion. (*See* Not. Of Hearing, ECF No. 95.)

55. The Motion is now ripe for resolution.

## IV. LEGAL STANDARD

56. In ruling on a motion to dismiss pursuant to North Carolina Rule of Civil Procedure 12(b)(6), the Court reviews the allegations in the Complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr. P.A. v. Medflow, Inc.,* 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health and Human Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

57. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (quoting *Laster v. Francis*, 199 N.C. App. 572, 577 (2009)). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6)

motion to dismiss into a Rule 56 motion for summary judgment. *Id.* (citing *Schlieper v. Johnson*, 195 N.C. App. 257, 261 (2009)). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citing *Robertson v. Boyd*, 88 N.C. App. 437, 441 (1988)).

58. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 7 (citing *Krawiec*, 370 N.C. at 606 and *Christenbury Eye Ctr.*, 370 N.C. at 5).

## V.    ANALYSIS

### A.    Breach of Fiduciary Duty

59. Griffin and GIA first seek dismissal of Loyd's breach of fiduciary duty claim brought against Griffin.

60. To state a claim for breach of fiduciary duty, the plaintiff must plead the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by

the breach. *Panzino v. MAP Mgmt. of Charlotte LLC,* 2021 NCBC LEXIS 13, *9 (N.C. Super. Ct. Feb. 12, 2021) (citing *Green v. Freeman*, 367 N.C. 136, 141 (2013)).

61. Shareholders of a corporation generally do not owe each other fiduciary duties, *Raymond James Capital Partners, L.P. v. Hayes*, 248 N.C. App. 574, 580 (2016), but there is an exception imposed on majority shareholders toward minority shareholders, *Meiselman v. Meiselman*, 58 N.C. App. 758, 774 (1982).

62. Business partners in North Carolina owe each other *de jure* fiduciary duties. *See HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588 (1991) ("[B]usiness partners . . . are each other's fiduciaries as a matter of law.").

63. Griffin argues that Loyd's fiduciary duty claim should be dismissed because he never owed Loyd fiduciary duties. Prior to Loyd's becoming a shareholder on 1 December 2018, Griffin argues there was no factual basis alleged that establishes either a *de jure* or *de facto* fiduciary relationship. (Br. Supp. 17–18.) After 1 December 2018, Griffin contends that the Second Amended Complaint alleges Griffin was a minority shareholder and therefore it is unsettled law in North Carolina as to whether a minority shareholder owes other shareholders a fiduciary duty. (Br. Supp. 18–19 (citing *Corwin*, 371 N.C. at 617).) In Griffin's view, Loyd has not sufficiently alleged that Griffin was a controlling minority shareholder under the exacting pleading standard set forth in *Corwin*. (Br. Supp. 19.)

64. Loyd, on the other hand, argues that the bases under which Griffin owed him a fiduciary duty are demonstrated throughout the factual allegations of the Second Amended Complaint. Loyd argues that there are several allegations of a

partnership between Griffin and Loyd that began from the onset of their business relationship and continued even after Loyd became a shareholder of GIA. (Br. Opp. 15–16.)

65. The Court agrees with Loyd that the Second Amended Complaint sufficiently alleges that Griffin owed a fiduciary duty to Loyd as a business partner. The Second Amended Complaint states throughout that Griffin and Loyd formed a partnership that remained in effect throughout all relevant transactions between them. Loyd begins the pleading by alleging that "Griffin and Loyd agreed to work together, and to combine their efforts, as partners at GIA, for the purpose of making and sharing the profits derived therefrom." (S. Am. Compl. ¶ 4.)

66. Such allegations of the ongoing partnership continue throughout the pleading, demonstrating that the transactions between Loyd and Griffin prior to the merger of LIA and GIA were done in continuance and furtherance of a partnership for profit. (*See, e.g.*, S. Am. Compl. ¶¶ 31–44.) The pleading specifically alleges that GIA's official share transfer records refer to Loyd and Patton as "partners" with Griffin on the 1 December 2018 transfer of shares. (S. Am. Compl. ¶ 65.) These facts suffice at the 12(b)(6) stage to allege that Griffin and Loyd shared mutual fiduciary duties towards each other as partners throughout the entirety of the relevant transactions as a matter of law. *See HAJMM*, 328 N.C. at 588.

67. The parties dispute whether Griffin owed Loyd a fiduciary duty by virtue of their relationship as GIA shareholders. Rebutting Griffin's arguments that his minority shareholder status defeats a breach of fiduciary duty claim, Loyd argues

that there are facts alleged that adequately demonstrate Griffin was a majority shareholder, or in the alternative, a controlling shareholder and therefore owed Loyd a fiduciary duty on those bases. (Br. Opp. 18–19.)

68. The allegations demonstrating a partnership between Griffin and Loyd at all relevant times are sufficient to establish that a fiduciary duty existed between them for the purposes of the claim surviving a 12(b)(6) motion. Accordingly, the Court need not address whether Griffin owed Loyd a duty pursuant to his shareholder status as a matter of law at the pleadings stage.

69. The facts as alleged tend to show that Griffin took advantage of his position of trust as Loyd's business partner to cause a merger between LIA and GIA, transfer shares of GIA stock to Loyd, and then ultimately reclaim Loyd's stock to sell to Leavitt for a large profit to himself. The Second Amended Complaint indicates that Griffin's actions were intended to and in fact directly caused the harm Loyd complains of; namely, Griffin's appropriation of Loyd's GIA stock. (*See, e.g.*, S. Am. Compl. ¶¶ 78, 80, 82–84, 89–90, 95–100, 162–63, 166–68.) This, combined with the adequately pled allegations that Griffin owed Loyd a fiduciary duty, is sufficient to state a cause of action for breach of fiduciary duty.

70. Further, Loyd's harm was unique and personal. Defendants argue that Loyd's harm was not appropriately brought as a direct action against GIA and Griffin. (Br. Supp. 21–22.) However, the pleading alleges facts that, when taken as true and in the light most favorable to Loyd, demonstrate Griffin acted in bad faith and attempted to use the Shareholders Agreement to provide cover of law to breach his

fiduciary duty and cause harms specific to Loyd, not to GIA as a whole or to all shareholders.

71. Accordingly, Loyd has sufficiently pled facts that, when the Court takes them as true and, in the light most favorable to the plaintiff under the standard for 12(b)(6) rulings, demonstrate that all the elements of a breach of fiduciary duty are met. Therefore, the Court DENIES the Motion as to that claim.

## B. **Constructive Fraud**

72. "In stating a cause of action for constructive fraud, the plaintiff must allege facts and circumstances (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of the plaintiff." *Watts v. Cumberland Cnty. Hosp. Sys., Inc.*, 317 N.C. 110, 116 (1986).

73. "A claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 482 (2004) (quoting *Terry v. Terry*, 302 N.C. 77, 83 (1981)). The element of a "relation of trust and confidence" is satisfied when there is a fiduciary duty owed to the plaintiff; constructive fraud is "based on a confidential relationship rather than a specific misrepresentation." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666 (1997).

74. Griffin argues that Loyd did not state a claim for constructive fraud because he did not sufficiently allege a fiduciary duty was owed to him by Griffin, and because Loyd did not sufficiently allege that Griffin used a position of trust to hurt Loyd. (Br.

Supp. 23.)  In Griffin's view, Loyd's alleged harm—the forced redemption of his GIA stock—was not caused by any malfeasance by Griffin.  Rather, according to Griffin, Loyd caused his own injury by breaching the Shareholders Agreement.  (Br. Supp. 23.)

75.    According to Griffin, GIA properly exercised its authority under the Shareholders Agreement to redeem Loyd's shares because Loyd's termination, resulting from his improper issuance of COIs, constituted a "triggering event."  (Br. Supp. 23.)

76.    Griffin's argument, however, misunderstands what Loyd alleges.  Griffin is the person against whom Loyd brought the claim of constructive fraud, not GIA.  (S. Am. Compl. 53.)

77.    Loyd's specific allegation is that Griffin, in his positions as sole director, CEO, and a shareholder of GIA, used his positions to his advantage and in bad faith—breaching his fiduciary duty to Loyd with the express purpose of receiving a benefit at Loyd's expense.  (S. Am. Compl. ¶ 191.)

78.    Loyd alleges that Griffin allowed and condoned the practice of issuing "questionable" COIs to family and clients that he later used as the "triggering event" under the Shareholders Agreement to justify Loyd's termination.  Supporting this theory, the Second Amended Complaint alleges that Griffin looked the other way when his subordinates issued defective COIs and alleges that Griffin's own family knowingly and directly benefited from this practice.  Further indicating that Loyd's termination was pretextual, the Second Amended Complaint alleges that NCDOI

conducted a routine audit investigation of GIA on 11 September 2019 and found "no apparent violations of North Carolina statutes and administrative codes," despite Griffin's knowing that GIA sometimes issued non-conforming COIs. (S. Am. Compl. ¶¶ 58–59.) Griffin only decided to audit COI issuance practices when there was a lucrative buyout deal on the horizon, and Griffin terminated Loyd despite Loyd only representing, at most, a sixth of the total defective COI claims issued by various GIA employees. (S. Am. Compl. ¶¶ 58–59, 78–80.)

79. These facts tend to show Griffin acted in bad faith when he invoked the "triggering event" language in the Shareholders Agreement to redeem Loyd's shares. Assuming the Shareholders Agreement's stock redemption provisions were in effect at the relevant time,[3] Loyd alleges facts that sufficiently demonstrate Griffin used his position of authority within GIA to terminate Loyd's ownership interest and appropriate it for himself through pretext to increase his personal profit in the sale to Leavitt. (Br. Opp. 25; S. Am. Compl. ¶ 191.)

80. Accordingly, Loyd sufficiently alleges that Griffin breached the fiduciary duty that Loyd was owed by selectively enforcing a policy against Loyd that Griffin

---

[3] Several paragraphs in the Second Amended Complaint tend to show that the forced stock redemption provision under the Shareholders Agreement may not have applied to Loyd. For example, Loyd alleges that he was an independent contractor and not an employee, such that the Shareholders Agreement's "triggering event" upon "termination of employment" did not apply to him. (S. Am. Compl. ¶¶ 103–06.) Loyd also alleges that the addition of Patton to the Shareholders Agreement constituted an amendment to the contract which barred any buying or trading of stocks pursuant to its own terms. (S. Am. Compl. ¶ 107.) Interestingly, Loyd did not bring a claim for breach of contract against Griffin or GIA. Therefore, the Court will only consider the Defendants' alleged actions under the context of the claims listed in the Second Amended Complaint.

condoned for years. Further, Loyd has alleged that the purpose and the result of that breach were to increase Griffin's profit upon the sale of GIA stock to Leavitt, at the expense of Loyd being forced to sell his stock to GIA (and ultimately Griffin) for a small fraction of the value under which it was being sold to Leavitt. These allegations support each element of a claim for constructive fraud.

81. Therefore, the Court DENIES the Motion as to the claim of constructive fraud.

C. **Conversion**

82. There are two elements in a conversion claim: (1) ownership in the plaintiff and (2) wrongful possession or conversion by the defendant. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). Crucial to a successful claim of conversion is the element of wrongful deprivation to the owner. *See Mace v. Pyatt*, 203 N.C. App. 245, 256 (2010) ("The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . .")

83. Loyd's claim for conversion centers on the "unlawful[ ] taking [of Loyd's] GIA shares" by both Griffin and GIA, and then selling those shares to Leavitt pursuant to the Sale Agreement. (S. Am. Compl. ¶ 196.) Loyd alleges that this transaction occurred "without authorization or legal justification." (S. Am. Compl. ¶ 195.)

84. Defendants argue that Loyd's allegations are contradictory on their face and, therefore, the conversion claim must fail. (Br. Supp. 24–25.) In Defendants'

view, by alleging the existence of the Shareholders Agreement and acknowledging its "triggering event" provision, the Second Amended Complaint also stipulates the lawfulness of Defendants' taking and reselling of Loyd's GIA stock. (Br. Supp. 24–25.)

85. Further, Defendants argue that by issuing defective COIs, Loyd was the cause of his own loss. (Br. Supp. 25.)

86. Loyd argues that a dispute over the Shareholders Agreement's validity, which is argued by Defendants to contradict the conversion claim, is not appropriate at the 12(b)(6) stage, but rather is a factual dispute more appropriate for later proceedings. (Br. Opp. 26.) Further, during the hearing on the Motion, Loyd's counsel argued that the allegations in the Second Amended Complaint demonstrate that—even if the Shareholders Agreement is valid—Defendants still converted Loyd's shares of GIA stock by selling them to Leavitt without first taking steps to reacquire them from Loyd.

87. In Loyd's view, Defendants should have taken steps to settle the dispute over Loyd's ownership of his GIA stock, such as by bringing a breach of contract action against him to enforce the terms of the Shareholders Agreement, before repurchasing his shares. Loyd argues that even if the Shareholders Agreement required that he sell his stock back to GIA, he never did—a fact apparent in the Second Amended Complaint. (*See* S. Am. Compl. ¶¶ 89–90, 97–100, 195–97.) Loyd's counsel at oral argument stated that Loyd had not been paid for the stock Defendants purportedly sold to Leavitt, even at the rate required under the Shareholders Agreement. Loyd's

counsel went on to argue that Griffin and GIA's actions were comparable to "self-help" in a contract dispute, which settled North Carolina law forbids.

88. The Court agrees with Loyd on multiple fronts. Foremost, the Second Amended Complaint sufficiently pleads the facts of conversion on its face. While a breach of contract action was not pled, Loyd has pled several facts that logically conclude, if proven, that Defendants wrongfully asserted ownership over Loyd's shares of GIA stock by selling them to Leavitt. *See supra* FN 1.

89. Loyd has pled facts that tend to show an ongoing dispute over the terms of the Shareholders Agreement and, assuming it is enforceable, whether its terms applied to Loyd. Loyd alleges that he was not an employee as defined by the Shareholders Agreement such that his termination is not a "triggering event" under the contract requiring him to sell his shares back to GIA. (S. Am. Compl. ¶¶ 103–06.) Further, Loyd also alleges that Patton's addition as a signatory to the Shareholders Agreement is an amendment that, under its terms, prevents further buying and selling of GIA shares—including under the "triggering event" clause. (S. Am. Compl. ¶ 107.)

90. Loyd alleges that the GIA stock sold to Leavitt as part of the Sale Agreement included Loyd's shares. (*See* S. Am. Compl. ¶ 168.) If proven true, these factual allegations lead to the conclusion stated in the conversion claim, that Defendants asserted ownership over Loyd's shares of GIA stock and promised them to Leavitt as part of the Sale Agreement without authorization or legal justification.

91. Put simply, even if the Shareholders Agreement is valid and required Loyd to sell back his shares to GIA, the dispute over its terms as alleged sufficiently pleads the wrongfulness of GIA's asserting ownership over Loyd's stock without first legally settling that dispute. Loyd alleges that he rejected the severance agreement with which Griffin approached him. (S. Am. Compl. ¶¶ 97–100.) Further, Loyd alleges that Griffin unilaterally caused GIA to cancel the stock certificate that transferred GIA shares to Loyd on 1 December 2018 to proceed with the Sale Agreement with Leavitt. (S. Am. Compl. ¶ 169.)

92. Under the facts as alleged, Defendants purported to sell Loyd's stock to Leavitt without first, either by consent or legal action, reacquiring that stock from Loyd. If, by not selling his stock back to GIA as required under the Shareholders Agreement, Loyd breached the Shareholders Agreement, Defendants' remedies would be to seek damages through legal action, *see, e.g.*, *Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 123 (1962), or seek specific performance, *see, e.g.*, *Willams v. Habul*, N.C. App. 281, 290–91 (2012).

93. Defendants allegedly took neither action before purporting to sell Loyd's stock.[4] Therefore, regardless of whether the Shareholder Agreement was valid, the Second Amended Complaint sufficiently pleads facts that demonstrate Defendants asserted an ownership interest they did not have in Loyd's stock through the Sale

---

[4] Defendants did file a counterclaim against Loyd seeking specific performance, but this occurred after the events Loyd alleges were conversion of his GIA stock. Loyd's argument that one cannot assert ownership over another's property and then seek specific performance afterwards advances the narrative already set forth by the pleadings.

Agreement with Leavitt.  Accordingly, Loyd has adequately pled facts stating a claim for conversion and the Court DENIES the Motion as to this claim.

### D.  Unjust Enrichment

94.  Loyd's fourth claim for relief of unjust enrichment is an alternative equitable claim should the Court find that Loyd's legal claims are not actionable.  (S. Am. Compl. ¶ 200.)

95.  "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591 (1984).  "In order to properly set out a claim for unjust enrichment, a plaintiff must allege that property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." *HOMEQ v. Watkins*, 154 N.C. App. 731, 733 (2002) (quotation omitted).  "The recipient of a benefit voluntarily bestowed without solicitation or inducement is not liable for their value." *Id*. (quoting *Wright v. Wright*, 305 N.C. 345, 350 (1982)).

96.  Defendants argue that unjust enrichment is not available as an alternative remedy under the pled facts because the facts show the existence of an actual agreement between the parties, i.e., the Shareholders Agreement.  (Br. Supp. 26.)  In Defendants' view, because the equitable remedy of unjust enrichment creates an implied contract between parties, such an implied contract is precluded by the express contract the parties already have.  (Br. Supp. 26–27.)

97.     Loyd rebuts Defendants' argument against the unjust enrichment claim by reiterating that the claim is in the alternative, and only meant to plead damages in the event that there is no legal remedy available to Loyd.  (Br. Opp. 27.)  Therefore, Loyd argues that it is an "entirely false notion that a claim in equity cannot be pled in the alternative to plaintiff's other claims at law."  (Br. Opp. 27.)  The Court agrees.

98.     While it is correct that an express contract precludes an implied contract, *see Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42 (1997), the Court must emphasize that the Motion is brought under Rule 12(b)(6), and that at the pleadings stage it is inappropriate for the Court to make factual determinations outside of the requirement that the Court take all allegations in the pleadings as true and resolve all inferences in the light most favorable to the plaintiff.

99.     Under that standard, the well-pled Second Amended Complaint alleges facts that tend to show the Shareholders Agreement was inappropriately applied to Loyd.  *See Supra* ¶ 97.  If, at later stages of the case, it is shown through evidence by either party that the express terms of the Shareholders Agreement are inapplicable to the facts of this case and that Loyd has no available remedy through his legal claims for relief, then Loyd is entitled to pursue the alternative claim in equity for damages he allegedly suffered.

100.    Accordingly, the Court finds that Defendants' arguments against the unjust enrichment claim are better resolved at summary judgment, after the parties have conducted discovery.

101. Therefore, the Court DENIES the Motion as to the claim of unjust enrichment.

E. **Constructive Trust & Accounting, Rescission, and Punitive Damages**

102. Loyd acknowledges in the Second Amended Complaint that his fifth claim for relief for the creation of a constructive trust and accounting as to the profit received by Griffin and GIA for Loyd's alleged harms is not a cause of action, but rather a prayer for relief upon the Court's equitable power. (S. Am. Compl. ¶¶ 207, 212.)

103. Likewise, as to the sixth claim for relief, Loyd has entitled it "Alternative Remedy of Rescission" and states that "plaintiff is entitled to the alternative remedy of the Shareholder's Agreement's recission" and that Loyd "prays the Court for an order to this effect." (S. Am. Compl. 56, ¶ 217.)

104. Finally, Loyd's seventh claim for relief seeks punitive damages pursuant to Chapter 1D of the North Carolina General Statutes, which he contends are appropriate due to Defendants' "intentional, continued, and egregiously wrongful acts. . . ." (S. Am. Compl. ¶¶ 219–20.) Again, punitive damages are a remedy, not a cause of action.

105. Accordingly, as to these three claims, the Court need not consider arguments for or against them at the 12(b)(6) stage. The remedies sought in the Second Amended Complaint are to be reserved for the finder of fact to award based upon the evidence presented as to the causes of action alleged.

106. Therefore, as to Second Amended Complaint's Fifth Claim for Relief for Constructive Trust & Accounting, Sixth Claim for Relief for Alternative Remedy of Rescission, and Seventh Claim for Relief for Punitive Damages, the Court GRANTS the Motion and denies those claims as such, without prejudice to Loyd's right to seek damages and remedies as permitted by law.

## VI. CONCLUSION

107. For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion as follows:

   a. the Motion is DENIED as to the breach of fiduciary duty claim;

   b. the Motion is DENIED as to the constructive fraud claim;

   c. the Motion is DENIED as to the conversion claim;

   d. the Motion is DENIED as to the unjust enrichment claim;

   e. the Motion is GRANTED as to the constructive trust and accounting claim;

   f. the Motion is GRANTED as to the rescission claim; and

   g. the Motion is GRANTED as to the punitive damages claim.

**IT IS SO ORDERED,** this the 23rd day of June, 2022.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases